IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| EDWARD LIEBSACK, as Guardian for MADLYN LIEBSACK,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; ANCHORAGE COMMUNITY MENTAL HEALTH SERVICES, INC.; RED OAKS ASSISTED LIVING, INC.; JOHN CASTILLO AND JULIET CASTILLO d.b.a. LAKEVIEW ASSISTED LIVING HOME I; ALASKA CARE CONNECTIONS, INC.; and JOHN DOE I AND JOHN DOE II,<br><br>　　　　Defendant. | Case No. 3:07-cv-0071-RRB<br><br>**\*\*\* INITIAL \*\*\***<br>**<u>FINDINGS OF FACT AND</u>**<br>**<u>CONCLUSIONS OF LAW</u>** |

　　　　Before the Court is a Complaint against the United States of America for malpractice pursuant to 28 U.S.C. § 2675 filed by Edward Liebsack, as Guardian for Madlyn Liebsack (Madlyn), against the remaining Defendant, the United States of America, acting on behalf of Anchorage Neighborhood Health Center (ANHC).

　　　　Plaintiff asserts that ANHC is liable based on two separate breaches of the applicable standard of care:

INITIAL FINDINGS AND CONCLUSIONS - 1
3:07-CV-0071-RRB

1. ANHC laboratory acted below the standard of care by failing to obtain a lithium level result; and

2. Dr. Grant acted below the standard of care by failing to determine the reason for Madlyn's October 16, 2002, appointment.

The Government denies these assertions and asserts that regardless of Defendant's conduct, the damages sustained by Plaintiff were unrelated, i.e. that Madlyn's elevated lithium level on November 10, 2002, was unrelated to and wholly separate from her condition in mid-October of 2002. Defendant further asserts that even if ANHC was responsible in some way for Madlyn's injuries, Madlyn's damages should be apportioned between several other tortfeasors pursuant to A.S. 09.17.080.

The Court sets forth below its Initial Findings of Fact and Conclusions of Law. **A Final Order and Judgment will be entered once the supplemental briefing requested has been received.**

I. **TRIAL**

Trial began on March 30, 2010, and continued intermittently until April 26, 2010. The testimony presented was largely technical and the quality of experts on both sides of the dispute was high. The Court took detailed notes throughout the trial but will not recount them here. In entering this Order, however, the Court studied the notes thoroughly and again reviewed portions of the trial testimony. Suffice it to say that Madlyn's injuries and

consequential damages were caused, in whole or in part, by a combination of unfortunate events and circumstances that were due to a difficult patient to manage, a busy and arguably overworked medical delivery system, communication errors, negligence, and bad luck.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Causation

The Court, after weighing the testimony and evidence presented, concludes that although close, it is more likely than not that Madlyn's lithium level on October 14, 2002, when her blood test was taken, was elevated and unsafe and that treatment during this critical period of time would have likely led to a lithium adjustment that would have likely prevented the cardiac arrest of November 10/11, 2002. In reaching this conclusion the Court is not overlooking testimony suggesting a reduction of symptoms between mid-October and November 10, 2002, but accepts the testimony from Plaintiff's experts and, in particular, Dr. Nosrati's testimony that such symptoms can wax and wane even when the lithium level is elevated and that the lithium level can be increasing even in the absence of overt symptoms. This conclusion is further buttressed by the rebuttable presumption against ANHC occasioned by the absence of the diagnostic blood test. See Fed. R. Evid. 302 and <u>Sweet v. Sisters of Providence in Washington</u>, 895 P.2d 484 (Alaska

1995).  Plaintiff's Pretrial Motion: Re Evidentiary Issues at **Docket 234** is hereby **GRANTED.**

    **B.**    **Nurse Cindy Jones**

Nurse Cindy Jones, of Anchorage Community Mental Health Services (ACMHS), was Madlyn's psychiatric nurse practitioner during the time in question and was solely responsible for prescribing and monitoring Madlyn's lithium intake.  It was Nurse Jones that first became concerned about Madlyn's lithium level in October of 2002 after receiving input from Lakewood Assisted Living Home (Lakewood), Madlyn's assisted living provider.  These concerns on Nurse Jones' part led Nurse Jones to order a blood test that included a request that a lithium level test be taken.  Although Nurse Jones did not refer Madlyn to Dr. Grant to evaluate Madlyn's lithium level, she did refer her to Dr. Grant to see if Madlyn might be having difficulties unrelated to her psychiatric medications.  Nurse Jones, however, failed to follow up on the laboratory request, failed to seek further testing, and failed to contact Dr. Grant regarding her concerns.  Moreover, it had been over eight months since Madlyn's last lithium level test, far longer than appropriated for one in Madlyn's condition. Given Madlyn's history and symptomology, testing should have been more frequent.  Had Nurse Jones done any of these things, much of the uncertainty regarding Madlyn's condition would likely have been

resolved. The Court concludes that Nurse Jones failed to exercise the degree of care required under the circumstances. Her acts, or failure to act, were a proximate cause of Madlyn's injuries.

### C. Lakewood

The Court concludes that it is more likely than not that Lakewood failed to accompany Madlyn to her October 16, 2002, appointment with Dr. Grant or otherwise notify Dr. Grant of their concerns regarding Madlyn's health. Given Madlyn's mental condition and her known inability to accurately communicate symptoms, Lakewood had a duty to accompany Madlyn to her medical appointments and notify health care providers of symptoms of possible lithium toxicity. Such a duty would be evident to lay people and expert testimony is therefore not required to establish that this duty exists. Defendant's Motion for Summary Judgment at **Docket 183** on this issue is hereby **GRANTED**. The Court must note, however, that this omission on the part of Lakewood pales in light of the fact that Nurse Jones, who was aware of Madlyn's symptoms, saw Madlyn on October 18, 2002, just two days after Madlyn's visit with Dr. Grant, and took no action to pursue the issue of lithium toxicity.

### D. ANHC

The Court finds that, although close, ANHC was negligent in not obtaining the lithium level test requested by Nurse Jones.

This mistake was, more likely than not, due to a transcription or clerical error, a simple, innocent mistake, that likely led to the lithium level test omission. The Court also recognizes the possibility that the test was omitted because Madlyn had taken her medication that day. If this was the case, though, some notation should have been made and some effort taken to notify Nurse Jones that the lithium level test was not taken. The absence of any such documentation again accrues to the detriment of ANHC. Madlyn could not have been relied upon to communicate such information to either Nurse Jones or Dr. Grant.

This omission on the part of ANHC was below the applicable standard of care and was a proximate cause of Madlyn's injuries, although it could have been readily mitigated had Nurse Jones followed up on her laboratory request, renewed the request, sought laboratory testing on an emergency basis locally, or conducted routine testing more often. Nurse Jones had the last best chance to discover and correct ANHC's omission.

### E. Dr. Grant

The Court does not find Dr. Grant to have been negligent under the unique facts of this case. Dr. Grant, who was generally aware of Madlyn's medical history and treated her for any variety of ailments, had no reason to suspect an elevated lithium level when she saw Madlyn on October 16, 2002. Madlyn was not in distress nor

INITIAL FINDINGS AND CONCLUSIONS - 6
3:07-CV-0071-RRB

exhibiting any outward signs of lithium toxicity at the time of this visit and neither Nurse Jones nor Lakewood gave Dr. Grant any reason for such concern. Furthermore, it was ACMHS and Nurse Jones who had been prescribing and monitoring Madlyn's lithium level. Had Dr. Grant received a referral regarding lithium level monitoring, she would have not taken it and referred the patient to a psychiatrist. The fact that Madlyn mentioned Nurse Jones to Dr. Grant did not create a duty on Dr. Grant's part to seek out Nurse Jones, especially given Madlyn's history of poor reporting. Moreover, when Nurse Jones saw Madlyn two days after her appointment with Dr. Grant, Madlyn was not exhibiting outward signs of lithium toxicity and Nurse Jones took no action with regard thereto. Neither did Dr. Grant have a duty, under the circumstances, to seek out Lakewood to see what concerns, if any, they might have for Madlyn.

**F. Damages**

**1. Non-Economic A.S. 09.17.010; A.S. 09.55.549**

Given the extreme nature of Madlyn's injuries and the likely fact that her life will be prematurely ended as a result, the Court awards the statutory maximum for non-economic damages. It is unclear to the Court whether the statutory maximum is $1 million as suggested in A.S. 09.17.010 or possibly less as suggested in

A.S. 09.55.549. The parties shall brief this issue as discussed below.

## 2. Past Medical

The Court concludes that the most reliable and most reasonable measure of damages for Madlyn's past medical expenses is the amount paid by Medicare/Medicaid rather than the billed amounts. See <u>Dyet v. McKinley</u>, 81 P.3d 1236, 1237-8 (Idaho 2003); see also <u>Lucier v. Steiner Corp.</u>, 93 P.3d 1052 (Alaska 2004)(Alaska Superior Court used amount paid by Medicaid as measure of damages and Alaska Supreme Court denied petition for interlocutory review). The difference between the amount billed and that paid is a collateral source for which Plaintiff is not entitled to recover. Otherwise Plaintiff would receive a windfall not justified under the Alaska collateral source rule.

## 3. Future Medical

Future damages must be based on past 2009 bills reduced by Medicare, reduced by costs for pre-existing medical problems, and reduced by the costs that Madlyn would incur at an assisted living facility, all reduced to present day value.

## 4. Ventilator

The Court concludes that it is more likely than not that Madlyn's need for a ventilator is due, in significant part, to the

cardiac arrest of 2002. Future medical expenses should therefore include these costs.

### 5. Apportionment A.S. 09.17.080

Damages in this matter must be apportioned among the various tortfeasors pursuant to A.S. 09.17.080.

The Court concludes that for the reasons previously stated, Nurse Jones was primarily responsible for Madlyn's injuries and hereby assesses 80% liability to Nurse Jones. The Court assesses 15% liability to ANHC for the failure to obtain a lithium level test. The Court assess 5% liability to Lakewood for failing to accompany Madlyn to her October 16, 2010, appointment with Dr. Grant and failing to otherwise report concerns to Dr. Grant regarding Madlyn's symptoms.

Given the Court's findings above, the parties shall have until **September 15, 2010,** to submit proposed findings regarding the money judgment Plaintiff is entitled to recover from Defendant. The parties shall specifically address and explain their view with regard to Madlyn's current life expectancy, their view regarding Madlyn's past medicals, and their view regarding Madlyn's future medical expenses reduced to present value. The parties shall also set forth their respective views as to the statutory maximum for non-economic damages. The Court expects the parties to set forth exactly how much money they believe must be paid assuming the

findings set forth above.  This is not to be used as a request for reconsideration. Any such motion must await the Court's final judgment.

**IT IS SO ORDERED.**

ENTERED this 2nd day of September, 2010.

                                        S/RALPH R. BEISTLINE
                                        UNITED STATES DISTRICT JUDGE